UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x
ANN MOLINA,

                Plaintiff,

  - against -

COUNTY OF ORANGE

                Defendant.
———————————————————————x

**ORDER ADOPTING SPECIAL MASTER'S LEGISLATIVE REDISTRICTING PLAN**

13 Civ. 3018 (ER)

RAMOS, D.J.:

       To help ensure the fair, orderly and lawful election of Representatives in the County of Orange, New York, the Court hereby adopts Special Master Carmen Beauchamp Ciparick's Report and Recommendations of June 3, 2013 (the "Special Master's Plan"), Dkt. 6, as modified by her Supplemental Report and Recommendations of June 13, 2013 (the "Special Master's Supplemental Plan"), Dkt. 9.  The Special Master's Plan divides the County into 21 districts based upon the 2010 census, and complies with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973, *et seq*.

**I. Procedural History**

      **a. The 2010 Census & Legislative Deadlock**

       In 2010, the Bureau of the Census conducted a census of the United States.  *See* U.S. Const. art. I, § 2, cl. 3.  The census results indicated that the total population for Orange County was 371,284.  Accordingly, for the purposes of creating County legislative districts, the "target population" for each district was 17,680.[1]  Special Master Plan at 2.  Using the target population

---

[1] The population data was provided by the New York Legislative Task Force on Demographic Research and Reapportionment ("LATFOR"), which adjusted the 2010 census data.  LATFOR's data removes state and federal

as a mean, the data revealed that several existing legislative districts deviated from the 2010 target population by more than plus or minus 5%. For example, existing Legislative District 1 has a current approximate population of 22,945, which is 29.78% above the targeted population and Legislative District 4 has a population of 15,135, which is 14.39% below the targeted mean. *Id*., Exhibit 2.

When the results of the 2010 census were released, Orange County, consistent with its County Charter (Article II, § 2.08), was required to begin the process of redistricting its legislative districts to comply with the federal requirements of "one person, one vote" and the Voting Rights Act of 1965. *Id*. at 1. However, the process of redistricting did not begin until the latter part of 2012, when the Orange County Planning Department was instructed by the Chair of the Legislature to enumerate the population of the County and prepare preliminary redistricting maps for the legislative committee handling the redistricting process. A preliminary map was prepared which included 21 legislative districts, each with a population as close to the target population of 17,680 as possible. *Id*., Exhibit 3 (Map Version 1). Working from this version, several iterations of the map were produced by the Planning Department. *Id*., Exhibits 4 (Map Version 2), 5 (Map Version 3) and 9 (Map Version 4).

The fourth version of the map, which included a Latino majority district in the City of Newburgh and a Latino plurality district in the City of Middletown, *id*., Exhibit 9, was presented to the full Legislature at a legislative session on April 5, 2013 for their approval or rejection. 20 out of 21 legislators were present that day, and the vote was 10 in favor of the plan and 10 against; this resulted in the rejection of the map. *Id*., Exhibit 11. Afterwards, a fifth version of

---

prisoners from the location of their prisons and re-assigns such prisoners for redistricting purposes to the location of their last known residence of record. The Special Master used LATFOR's "target population" of 17,680, Special Master Plan at 2, and the Court will base its analysis upon such baseline.

the map was prepared, *id*., Exhibit 12, but, the Rules Committee of the County Legislature declined to present the map for discussion at its meeting of April 23, 2013; it was resolved that the upcoming general election for County legislators, scheduled to be held in November 2013, should be based on existing 2005 district lines.  *Id*. at 5-6.  The existing 21 legislative districts were created in 2005 using the 2000 census data.  *Id*. at 1.

      **b.  Judicial Intervention**

On May 6, 2013, Plaintiff Ann Molina commenced this action against Orange County. Dkt. 2.  Plaintiff is a voter who resides in Legislative District 14, which has a population of 21,629 and, accordingly, deviates by 22.34% from the target population.  Plaintiff alleges that her vote, as well as the vote of other residents in her legislative district, is "minimized and diluted" when compared with the residents of other districts.  Accordingly, Plaintiff alleges one claim under the Fourteenth Amendment to the United States Constitution:  a one-person, one-vote challenge to the County's plan as a whole.  Also, although not specifically enumerated in the Complaint, Plaintiff appears to challenge the County's plan pursuant to Section 2 of the Voting Rights Act of 1965.

Also on May 6, by way of Order to Show Cause, Dkt. 1, Plaintiff sought a temporary restraining order and a preliminary injunction requesting, *inter alia*:  (1) the enjoining of the upcoming November 2013 election for the County Legislature; (2) the enjoining of any primary elections using the current 2005 legislative districts; and (3) appointing a Special Master to promptly recommend a new legislative map.  *Id*.

On May 10, the parties appeared before the Court for a hearing on the Order to Show Cause.  The parties reached agreement on certain matters, and on May 14, on consent of the parties, the Court ordered as follows:

1. The 2013 elections for the Orange County Legislature shall not be held based upon the legislative districts established in 2005, in reliance upon the 2000 census.

2. The schedule previously established by which candidates for the County Legislature circulate designating petitions, challenge other candidates' petitions and allow administrative and judicial resolution of any such challenges cannot be practically adhered to and is hereby preliminarily enjoined.  The Board of Elections of the County of Orange is so enjoined, solely to the extent set forth herein, and may otherwise discharge its duties with respect to all elections which are not dependent upon the redistricting demanded in the Complaint filed in this matter.

3. Because the election of County Committee members for both the Republican and Conservative Parties relies upon the 2000 census, and the parties have stipulated as such, petitioning for said positions is also enjoined pending the development and approval of a constitutionally compliant redistricting map for the Orange County Legislature.

By way of the same Order, this Court appointed the Honorable Carmen Beauchamp Ciparick, Counsel to Greenberg Traurig LLP, as Special Master, pursuant to Fed. R. Civ. P. 53(a)(1)(A) and 65.  Dkt. 5.  The Court instructed the Special Master, *inter alia*, to "propose a new set of legislative districts that are in compliance with the principles of one person/one vote and the Voting Rights Act of 1965" and to "make every effort to provide the Court with a proposed map by or before June 3, 2013."  The Order also instructed the County Planning Department to assist the Special Master, and authorized the Planning Department to develop one or more maps consistent with the law and to present the same to the Special Master.  *Id*. at 3.

    **c.  Work of the Special Master & Special Master's Plan**

Special Master Ciparick worked closely with the Planning Department, and received assistance from Commissioner David Church and planners Megan Tennerman and Matthew Ryan.  She also retained Henry M. Greenberg, Esq., a shareholder at Greenberg Traurig, to assist in the redistricting process.

On May 23, Special Master Ciparick held a meeting with the Planning Commissioner, the two planners, the lawyers for the parties, as well as David Darwin, County Attorney, and Henry Greenberg from Greenberg Traurig. According to Special Master Ciparick, the meeting was productive and yielded what she believed to be a fair resolution of the controversy and a constitutional re-drawing of the Legislative District lines. Special Master Plan at 7-8.

On June 3, 2013, Special Master Ciparick filed her Report and Recommendations with the Court. In her report, the Special Master noted that the parties were in agreement with her proposed redistricting plan. *Id*. at 15-16. The Special Master made recommendations for all existing 21 districts; however, the major changes to the Orange County legislative map occurred in Legislative Districts 4 and 6, which are part of the City of Newburgh and which have substantial Latino and African-American communities.[2] Specifically, the Special Master noted:

> Information received during the redistricting process implied that the residents of the City of Newburgh were concerned about the balance of racial and ethnic groups as represented in the city's legislative districts (Legislative Districts 4 and 6); specifically, the residents wanted to ensure that African-Americans and Latinos were proportionally represented in each of the city's districts.
>
> In order to create two districts that have a majority nonwhite population and a representation of African-Americans and Latinos in each district that is proportional to their representation in the city, each of the districts must contain election districts located outside the city, instead of one district entirely within the city and one containing election districts both inside and outside the city boundary.
> . . .
> The 2010 adjusted population of . . . proposed [D]istrict [4] is 16,955, 4.1% lower than the target population, provides a Latino population that is 43.1%, an African-American population of 34.5% and a combined minority population of 77.6%.
> . . .
> The 2010 adjusted population of the proposed [D]istrict [6] is 18,023, 1.94% higher than the target population, provides a Latino population that is

---

[2] The 2010 adjusted population of existing Legislative District 4 is 15,135, 14.39% lower than the target population, and the population for existing Legislative District 6 is 16,692, 5.59% lower than the target population. *Id*. at 18, 20.

5

>42.1%, an African-American population of 21.4% and a combined minority population of 63.5%.

*Id*. at 18-22.  The effect of the proposals was to create two majority-minority districts in Districts 4 and 6.  *Id*.

### d. Opportunity for Public Comment

By Order dated June 4, the Court scheduled a public hearing for June 12 at the Honorable Charles L. Brieant Jr. Federal Building and Courthouse, in White Plains, New York.  The Order also invited written public comment on the Special Master's plan by June 7. Dkt. 7.

Notwithstanding the County's prior consent to the Special Master's recommendations, on June 6, Benjamin Ostrer, attorney for the County, submitted a letter to the Court suggesting two alternative proposals to the map.  First, Mr. Ostrer suggested separating Town of Newburgh Republican incumbents Leigh Benton and Mike Anagnostakis, who are currently both located in proposed Legislative District 16, and who otherwise could be forced into a primary race by the district lines drawn by the Special Master.  Mr. Ostrer further asserted that this alternative "[would] also produce more geographically compact districts and recognize[] the rural nature of the northerly portions of Montgomery and the Town of Newburgh . . . ."  As a second alternative, Mr. Ostrer suggested further balancing of the populations of proposed Legislative Districts 16 and 17.  The Court notes that in his letter, Mr. Ostrer acknowledged that the Special Master's map "has addressed the constitutional claims raised in the complaint and representation issues with minority communities."

In response to Mr. Ostrer's letter, the Planning Department provided the Court with an analysis of Mr. Ostrer's proposals.  First, according to the Planning Department, Mr. Ostrer's

proposed changes would not have an impact on the majority-minority districts created in the City of Newburgh (Districts 4 and 6).  Second, the Planning Department suggested that Mr. Ostrer's first proposal, preserving incumbency for Legislators Benton and Anagnostakis, would split the Town of Montgomery into three legislative districts instead of two, would actually reduce the compactness of the proposed legislative districts, and would increase the degree of variance for each proposed district.  For example, according to the Special Master's current proposal, the population of Legislative District 16 would be 17,482, 1.12% below the target population of 17,680, and the population of Legislative District 17 would be 17,887, 0.61% higher than the target population.  According to Mr. Ostrer's first alternative, the population of proposed Legislative District 16 would be modified to 17,135, 3.08% below the target population, and the population of proposed Legislative District 17 would be 18,234, 3.13% higher than the target population.  According to the Planning Department, "While these proposed populations are within the acceptable margin of error, they represent a substantial increase in the variance from the target population for no reason other than to preserve incumbency."

   Mr. Ostrer's second proposal would not preserve incumbency, and according to the Planning Department, it would be less geographically compact than the Special Master's current proposal.  It would bring the population of proposed Legislative District 16 to 17,843 (0.92% higher than the target population of 17,680) and proposed Legislative District 17 to 17,526 (0.87% lower than the target population), bringing the districts more in balance with each other and lessening the degree of variance for proposed District 16.  However, it would increase the degree of variance for proposed District 17.

Aside from Mr. Ostrer's letter and the Planning Department's response, there was only one written submission sent to the Court. This submission, made by a private citizen of Orange County, asked the Court to refrain from considering classifications such as ethnicity, economic status and political party affiliation when creating legislative districts.

### e. Petition

On June 5, the Court entered the parties' Order modifying the electoral process in Orange County for the 2013 legislative elections as follows:

1. Petitions for county legislative seats shall be circulated on or after June 18, 2013.

2. Petitions shall be returned on or after July 11, 2013.

3. The number of signatures required on nominating petitions shall be decreased from 5% to 2.5% of the registered voters in the given political party within the legislative district.

4. Nominating petitions for committee persons for Republican and Conservative parties shall be reduced to 50% of the previously or otherwise required number.

5. All other deadlines provided by the Election Law of the State of New York shall remain in full force and effect.

Dkt. 8.

### f. June 12, 2013 Public Hearing

The hearing on June 12, 2013 was well attended and extremely helpful to the Court. Mr. Ostrer and Michael Sussman, counsel for Plaintiff, spoke in favor of Mr. Ostrer's first proposed modification to the Special Master's Plan. They advocated in favor of allowing Legislators Benton and Anagnostakis to continue to represent their respective Legislative Districts 16 and 17 if re-elected in the 2013 election, thus avoiding a possible contest between them.

The Special Master supported the attorneys' position and noted that while the proposed populations for Districts 16 and 17 represented an increase in the variance from the target

population of 17,680, the proposed populations were within an acceptable plus or minus 5% margin of variance. She further stated that the modification would have no impact on Districts 4 and 6, which would result in two majority-minority districts for the City of Newburgh, and did not violate either the one-person, one-vote rule or the Voting Rights Act of 1965.

During the hearing, the Court noted that the Supreme Court has indicated that avoiding contests between incumbents is a valid and neutral state districting policy. Citing *Tennant v. Jefferson Cnty. Comm'n*, 133 S. Ct. 3, 8 (2012) and *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). Accordingly, Mr. Ostrer's first proposal was not invalid simply for its intent to preserve the positions of Legislators Benton and Anagnostakis.

The Court also heard from five members of the public: Ralph Caruso of Highland Mills, Town and Village of Woodbury; Dennis Lynch, counsel to the Town of Woodbury; Sonia Ayala of Monroe; Ernesto Tirado of Newburgh; and Patricia O'Dwyer from Chester. Ayala, Tirado and O'Dwyer spoke on behalf of the proposed redistricting plan, while Caruso and Lynch raised concerns about the Town and Village of Woodbury.

**g. Special Master's Supplemental Report & Recommendations**

On June 13, 2013, the Special Mater submitted a Supplemental Report and Recommendations to the Court. Dkt. 9. The Special Master proposed two modifications to her Plan: one to Districts 16 and 17 and another to a footnote concerning the Town and Village of Woodbury.

i. <u>Districts 16 and 17</u>

In drafting her Plan, the Special Master did not consider incumbency nor partisan political interests. However, she stated that "the avoidance of a contest between incumbent representatives is a valid policy that may justify the increased deviation from the target

population number here," and, accordingly, "the Special Master supports the recommended modification [of Mr. Ostrer] as it has no effect on the constitutionality or legality of the proposed plan which remains faithful to the one person/one vote rule and complies with the mandates of the Voting Rights Act." *Id*. at 2.

The Special Master thus proposed a modification of Legislative Districts 16 and 17, and explained:

> The proposed configuration of Legislative District 16 includes the northern half of the Town of Newburgh, from the County boundary south to the hamlet of Balmville in the eastern part of the district, including the Orange Lake area, and the area of the Town of Montgomery north of the Village of Walden between the Newburgh/Montgomery town line and Route 208. This configuration preserves incumbency for the existing legislators in Legislative Districts 16 and 17. The 2010 adjusted population of Legislative District 16 is 17,135, 3.08% lower than the target population.
> . . .
> The proposed configuration of Legislative District 17 includes the Village of Walden; the eastern half of the Town of Montgomery between the Village of Walden, the Village of Maybrook and the Newburgh/Montgomery town line; and portions of the western area of the Town of Newburgh, including Meadow Hill and Winona Lake . . . The 2010 adjusted population of proposed Legislative District 17 is 18,234, 3.13% higher than the target population.

*Id*. at 4-5.[3]

## II. Applicable Constitutional and Statutory Law

### a. One-Person, One-Vote Claim

The principle of "one person, one vote" is grounded in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Reynolds v. Sims,* 377 U.S. 533 (1964). It prohibits the dilution of individual voting power through state districting plans that allocate legislative seats to districts of unequal populations and accordingly diminish the

---

[3] The Special Master also addressed the concerns of the Town and Village of Woodbury through a revision to Footnote 5 to her original Special Master's Recommendation and Report. *Compare* Special Master's Plan at 15 n.5 *with* Supplemental Plan at 5.

relative voting strength of each voter in overpopulated districts.  In *Reynolds*, the Supreme Court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."  The Court required states to "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable."  *Id.* at 577.

      The Supreme Court has held that absolute population equality is required for congressional districts, *Karcher v. Daggett,* 462 U.S. 725, 732-33 (1983); however, districting plans for state legislative seats require only "substantial" population equality.  *See Gaffney v. Cummings,* 412 U.S. 735, 748 (1973).  The Court has recognized that minor deviations from absolute population equality may be required to allow states to pursue other legitimate and rational state policies.  *See Reynolds,* 377 U.S. at 577-81; *see also Mahan v. Howell,* 410 U.S. 315, 321-22 (1973).  State policies that justify minor deviations from absolute population equality generally include "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives."  *Karcher,* 462 U.S. at 740.

      Since the advancement of these state policies will often require "minor deviations" from absolute population equality, the Court has held that such minor deviations, without more, are insufficient to establish a prima facie case of invidious discrimination.  *Voinovich v. Quilter,* 507 U.S. 146, 160-62 (1993).  In *Brown v. Thomson,* 462 U.S. 835, 842 (1983), the Court held that redistricting plans with a maximum population deviation below ten percent fall within the category of minor deviations that are insufficient to establish a prima facie violation of the Equal Protection Clause.  "Thus, a redistricting plan with a maximum deviation below ten percent is prima facie constitutional and there is no burden on the State to

justify that deviation." *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1031 (D. Md. 1994) (three-judge court); *see Fund for Accurate & Informed Representation, Inc. v. Weprin,* 796 F.Supp. 662, 668 (N.D.N.Y. 1992) (three-judge court), *aff'd mem.,* 506 U.S. 1017 (1992); *Cosner v. Dalton,* 522 F.Supp. 350, 357 n.11 (E.D.Va. 1981) (three-judge court).

Nevertheless, compliance with *Brown* 's "ten percent rule" does not end this Court's inquiry. There is still a question of how the "ten percent rule" conforms with *Reynolds* and its progeny, which require a "good faith effort" by the state to achieve "as nearly of equal population as is practicable." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 364 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004) (quoting *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362).

The parties here agree that Special Master Ciparick's plan meets the requirement of "one person, one vote." The Special Master has redrawn the legislative district lines to comply with the target population of 17,680 to the extent possible, and the resulting districts have a deviation of less than five percent from the target population. The Court's review of the Special Master's Plan reveals a good faith effort to create districts of nearly equal population in each of the 21 proposed Legislative Districts.

    a.  **Voting Rights Act Claim**

Section 2(a) of the Voting Rights Act ("VRA") provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color [or membership in a language minority group]." 42 U.S.C. § 1973(a). Section 2(b) provides that a "denial or abridgement" occurs where,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State ... is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (emphasis in original).

To establish a section 2 violation, a plaintiff must first establish by a preponderance of the evidence three threshold conditions articulated in *Thornburg v. Gingles,* 478 U.S. 30 (1986): (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that [the minority group] is "politically cohesive"; and (3) that "the white majority vot[es] sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."  *Growe v. Emison,* 507 U.S. 25, 40 (1993) (quoting *Gingles,* 478 U.S. at 50-51).  A plaintiff asserting vote dilution must also show "that, under the totality of the circumstances, the State's apportionment scheme has the effect of diminishing or abridging the voting strength of the protected class." *Voinovich v. Quilter,* 507 U.S. 146, 157 (1993).

"[Section] 2 can require the creation of a 'majority-minority' district, in which a minority group composes a numerical, working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 3 (2009) (citing *Voinovich v. Quilter,* 507 U.S. 146, 154–155 ("Placing black voters in a district in which they constitute a sizeable and therefore "safe" majority ensures that they are able to elect their candidate of choice.").  "Majority-minority districts are only required if all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances." *Bartlett*, 556 U.S. at 24.

The parties agree, and the Court finds, that the Special Master's plan addresses the racial discrimination issues implicitly raised by Plaintiff by creating majority-minority districts in Districts 4 and 6.

### III. Conclusion

For the foregoing reasons, the Court adopts in its entirety the Special Master's Plan, Dkt. 6, as modified by her Supplemental Plan, Dkt. 9.

SO ORDERED.

Dated:  June 14, 2013
        White Plains, New York

_____
Edgardo Ramos, U.S.D.J.